IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-cr-00227-CMA

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.   **CRAIG MICHAEL PEARSON**,
2.   LUIS FABIAN ORTIZ,
3.   JESUS ADRIAN PADILLA-ECHEVERRIA, and
4.   LUIS RENE ZAVALA-ACOSTA,

       Defendant.

---

## DEFENDANT PEARSON'S MOTION FOR BELOW-GUIDELINE SENTENCE

---

Defendant, Craig Michael Pearson ("Mr. Pearson"), by and through undersigned counsel, David E. Johnson, hereby files this Motion for Below-Guideline Sentence, thereby requesting the Court impose an imprisonment sentence of <u>97 months</u>, or if the Court finds that it is bound by the otherwise applicable mandatory minimum then, in that situation, a sentence of <u>120 months</u>.  In support thereof, Mr. Pearson states as follows:

### INTRODUCTION

The advisory guideline range in this case is **121 to 151 months**. *See* Doc. 98 ("PSR") at ¶ 120.  The guideline range is advisory, *United States v. Booker*, 543 U.S. 220 (2005), and the range of sentencing options is broad.  *See, e.g., Spears v. United States*, 555 U.S. 261 (2009); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Rita v. United States*, 551 U.S. 338 (2007). After calculating and considering the advice of the Guidelines, the court must then turn to an

"individualized assessment" of Mr. Pearson's case based on the facts presented. *Gall*, 552 U.S. at 50.

Similarly, when making these individualized assessments, sentencing courts are free to categorically disagree with the Guidelines' recommended sentence in any particular case, and may impose a different sentence based upon a contrary view of what is appropriate under Section 3553(a). This includes the freedom to merely disagree with a guideline's computations and the policy decisions that are contained in the guideline. *See Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011) (holding that, post-*Booker*, a sentencing court may in appropriate cases impose a non-guideline sentence based on a disagreement with the Commission's views); *Spears*, 129 S. Ct. at 843 (confirming *Kimbrough*'s holding that courts may vary from guidelines based solely on categorical disagreements with the Commission's Guideline). *See also United States v. Santillanes*, 274 F. App'x 718 (10th Cir. 2008) (reversing because the district court erroneously believed it did not have the ability to impose a below-guideline sentence based on **a policy disagreement with the methamphetamine guideline**).

Further, in most cases of this type, the Court would be bound by a statutory mandatory minimum sentence of 120 months. *See* 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). However, as argued below, this case is unique. Here, the Court has the ability to impose an equitable remedy due to law enforcement sentencing manipulation.

Thus, freed from the constraints of the statutory mandatory minimum, and after considering the Section 3553(a) analysis, this Court should impose an imprisonment sentence of <u>97 months</u>. Such a sentence would correspond to the top of the range that

would apply under the Guidelines relating to a mixture containing a detectable amount of methamphetamine, rather than actual/pure methamphetamine.  If calculated without the Guideline's level for "Ice" methamphetamine, the range is **78 to 97 months**.[1] *See* Doc. 98-1 at 2 n.1.  In the alternative, should the Court believe that it does not have the ability to sentence below the mandatory minimum, the Court should impose an imprisonment sentence of 120 months.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

This case involves two drug sales to an undercover DEA agent. Mr. Pearson was involved in both.  He is not a kingpin. He is not sophisticated.  Based upon the messages between him and the agent, it is clear he is not a source of drugs; he has to find it from others. In fact, the agent had to "reach back out" to Mr. Pearson or "reengage him" in order to complete the two sales. Mr. Pearson is also an addict – he has been for a long time. He had been living an unstable life, and he sold drugs to support his addiction.

**February 4 to March 22, 2019:**

On February 4, 2019, an undercover DEA agent contacted Mr. Pearson on his band's Facebook page. The two began messaging back and forth, sometimes discussing drugs, specifically methamphetamine.  Between February 13 and March 20, the agent did not have any contact with Mr. Pearson.  According to a DEA report, on

---

[1] The base offense level would be 30, based on a total drug quantity of 573.069 grams of methamphetamine (consisting of 27.77 grams sold to the DEA agent on March 25; 516.6 grams from the sale to the agent on April 26; and 28.7 grams found in Mr. Pearson's vehicle on April 25). After accounting for acceptance of responsibility, the total offense level reduces to 27.

March 20, the DEA agent "reengaged in Facebook messenger conversation" with Mr. Pearson. They began discussing meeting up. The agent told Mr. Pearson that if he got a decent price to "keep me in mind." At one point on March 20, the agent asks Mr. Pearson if he can sell 2 ounces for $450. Mr. Pearson said he would try. Eventually it is discussed that Mr. Pearson can sell the undercover agent 2 ounces of methamphetamine for $450 ($225 an ounce). On March 22, the agent asks if Mr. Pearson can meet him Monday, which would be March 25, 2019. Mr. Pearson agrees.

**March 25, 2019 (Mr. Pearson makes $25):**

The sale occurred on March 25, 2019, as planned. But instead of being for 2 ounces, it was only for 1 ounce. Mr. Pearson arrived at the agreed-upon location in his Chevrolet Tahoe. The agent approached Mr. Pearson's car. According to audio surveillance of the deal, Mr. Pearson said he only had one ounce. He asked the agent if he wanted to do a "hot rail", meaning snort some methamphetamine with him; the agent declined. Mr. Pearson also said he needed to sell it for $300 an ounce. He told the agent that he bought it for $275 an ounce. In other words, Mr. Pearson was only making $25 on the sale.

The agent followed Mr. Pearson back to his residence, as requested. The agent waited in his car while Mr. Pearson went into the house. When Mr. Pearson came back out of the house, he got back into his Tahoe. The agent joined him in the Tahoe. At that point, Mr. Pearson gave the agent the methamphetamine. Mr. Pearson said that he was selling drugs as a "side hustle" to make some additional money. He explained that his main job was to sell random items on e-Bay or go to auctions and sell/buy/trade

items.  *Cf.* PSR at ¶ 109.  Mr. Pearson and the agent discussed the price for larger quantities of methamphetamine: $1,000 for a quarter pound; $1,800 for a half-pound; and between $3,200 and $3,400 for a pound.

Once ounce equates to approximately 28 grams.  The drugs were tested.  It had a gross weight (counting packaging and DEA's plastic bag) of 57.5 grams; the net weight of the actual methamphetamine was 27.77 grams.

**March 26 to April 24 (trying to arrange a 1-pound methamphetamine deal):**

The day after that sale, on March 26, the agent messaged Mr. Pearson on Facebook, saying, *inter alia*, "I'll hit you up for more."  But over the next two weeks, they do not discuss methamphetamine.  Then, on April 17, the agent – according to a DEA report – "reached back out" to Mr. Pearson, saying that he was hoping Mr. Pearson "could get me a price."  Mr. Pearson said he would get him prices "in a few", but apparently he never did.

On April 22, the agent messaged Mr. Pearson again.  He asked for a price on a full pound of methamphetamine.  Mr. Pearson said that he should have an answer for him in an hour. Approximately four hours later, Mr. Pearson responded: "hey we are looking at 32 to 33 for the full one."  The agent said that he thought he could get the money together this week, and Mr. Pearson said he needed "to know for sure to have it set."  Later, the agent responded he was "thinking Thursday [which would be April 25] should work", and Mr. Pearson replied "let me know I'll be ready". The agent asked if Mr. Pearson "can have it in hand and shit or we got to go to a bunch of places and

piece it." Mr. Pearson responded "it should be a quick one" and assured the UC that it is "usually pretty smooth the people I deal with."

The next day, April 23, the agent checked to see if Thursday morning would work. Mr. Pearson said "my guy might be working" but he would check. The day after that, the agent messaged Mr. Pearson: "?"; Mr. Pearson responded that his supplier went out of town, but "my other friend has it too" but for $3,400 per pound instead of $3,300. The agent agreed to that deal: one pound for $3,400.

But Mr. Pearson then messaged that he still needed to makes sure it would work. He also asked the agent to "kick me a ½ oz for making it happen." A couple of hours later, not having heard back from Mr. Pearson, the agent messaged: "Any word yo?" Three-and-a-half hours later, Mr. Pearson answered: "hey all good tomorrow is a go."

**April 25, 2019**

**Mr. Ortiz finds a pound of methamphetamine to complete the sale:**

On April 25, Mr. Pearson met with the DEA agent. Unlike on March 25, this time he was not alone. With Mr. Pearson was with two other people, including a friend named Mr. Luis Fabian Ortiz (co-defendant number 2). According to what law enforcement was told, it was Mr. Ortiz who found the pound of methamphetamine that would be sold to the DEA agent.

Specifically, at around 12:30 pm on April 25, Mr. Ortiz contacted his friend, Mr. Manuel Barron-Villalobos ("Manny"). According to what Manny told law enforcement, Mr. Ortiz called Manny on a Facebook audio call, and he asked Manny if he could

6

provide him (Ortiz) with a pound of methamphetamine. Manny told Mr. Ortiz that he no longer sold drugs. However, Manny was at an apartment with Mr. Zavala-Acosta (co-defendant number 4). The night before, Mr. Zavala-Acosta asked Manny if he wanted to buy methamphetamine. *See* PSR at ¶ 27. Based on that conversation, Manny said he asked Mr. Zavala-Acosta if he could sell Mr. Ortiz the pound of methamphetamine. Mr. Zavala-Acosta said he would, and Manny told Mr. Ortiz to come to the apartment. (N.B.: Eventually, law enforcement questioned Manny, who conveyed the above information. He was discovered to have $500 in official funds that the undercover DEA agent used to purchase the methamphetamine. Manny is not charged in this case.)

**Mr. Pearson and two passengers meet the DEA agent; the agent asks for 3 more ounces:**

On April 25, 2019, Mr. Pearson arrived in the parking lot of a King Sooper's to meet the DEA agent. Mr. Pearson was driving his Tahoe. He had two passengers with him. One passenger was Mr. Ortiz, who was sitting in the back seat of the Tahoe. Another passenger was a female, who was sitting in the front passenger seat of the Tahoe.

At approximately 1:20 pm, Mr. Pearson entered the DEA agent's car. The two had a short conversation. He told the agent that the female in the car is his girlfriend, and that the male is his good friend. Mr. Pearson told the agent that the methamphetamine today was coming from his friend's friend: "It's his dude. We're going to go see one of his homies." That is consistent with what Manny subsequently told law enforcement, as detailed above. Mr. Pearson did not know Manny. Later,

while looking over at Mr. Ortiz who was still in the back seat of the Tahoe, Mr. Pearson also told the DEA agent that "he's just waiting for a phone call."

Mr. Pearson told the DEA agent that they were going to drive to the residence of his friend's friend, and Mr. Pearson would bring back the pound of methamphetamine, minus the half ounce they had agreed Mr. Pearson would keep.

At that point, the DEA agent asked Mr. Pearson if he could buy additional ounces. Mr. Pearson was unsure, saying he did not know if the source could do it. The DEA agent said that if the source could sell 3 additional ounces, at $200 an ounce, then he (the agent) would let Mr. Pearson keep an entire ounce (instead of just a half ounce). So the total sale would be for 1 pound and 3 ounces, for $4,000.

Mr. Pearson said he would go let his friend know of that proposal (referring to Mr. Ortiz), but that he'd have to see if the source could do it. "I'm going to go holler at my boy," he answered. Mr. Pearson said he couldn't guarantee the additional sale and he would have to check; "we'll see."

After that, Mr. Pearson left the DEA agent's car and returned to his Tahoe. After several minutes, the agent was told where to follow to. Outside of earshot of the Tahoe, the DEA agent communicated with other law enforcement (who was listening in on the conversations); the agent said he thought they were going to "Galley and Academy", but he also said "but I couldn't really understand the dude in the back." Apparently, the "dude in the back" seat of the Tahoe – i.e. Mr. Ortiz – was telling the DEA agent where to go and the closest main intersection of where they were going.

After following the Tahoe for an approximate 13-minute drive, they arrived at a residential apartment complex at approximately 1:47 pm (according to a DEA report). Mr. Pearson said that the DEA agent would not be able to drive separately to the location of the source. Mr. Pearson asked the DEA agent to drive in the Tahoe with them. The DEA agent said he would not do that. At that point, the female suggested: "What if I stay here with you?" After some discussion, it was agreed that the female in the Tahoe would stay back with the DEA agent, while Mr. Pearson and Mr. Ortiz went to get the methamphetamine in the Tahoe.[2] The DEA agent then gave Mr. Pearson $4,000.[3] He confirmed to the agent that if the additional three ounces could not be bought, then he would get $600 back.

**Mr. Pearson and Mr. Ortiz drive to the Source; Mr. Pearson remains in the car:**

At approximately 1:52 pm, Mr. Pearson and Mr. Ortiz left the residential parking lot in the Tahoe. Other DEA officers followed the Tahoe to a nearby apartment complex. Once they arrived, Mr. Ortiz got out of the Tahoe and went to an apartment on the second floor of the complex. Mr. Pearson remained in the Tahoe. At approximately 2:00 pm, surveilling DEA agents saw Mr. Ortiz walk back from the unknown apartment to the Tahoe with a plastic bag in hand. Five minutes later, at 2:05

---

[2] While waiting with the agent in his car, Mr. Pearson's girlfriend engaged in small talk with the agent. She told the agent that she knew Mr. Pearson since 2015, and they've been dating for two years. "You can always count on his word," she said about Mr. Pearson. Later she reiterated: "Craig will never [screw] you over; he won't."

[3] The make-up of the $4,000 was 100 twenty-dollar bills, 30 fifty-dollar bills, and 5 one-hundred-dollar bills. The denominations would have permitted the agent to provide Mr. Pearson with $3,400 (instead of $4,000).

pm, "Manny" was seen walking from the apartment complex, coming up to the Tahoe, and then returning to the apartment. Mr. Pearson never got out of the Tahoe.

Meanwhile, approximately 13 minutes after leaving the DEA agent, the DEA agent told Mr. Pearson's girlfriend that Mr. Pearson just messaged him. "He just messaged me," the agent tells her. He then read the message to her: "We waiting on the other 3," referring to the additional three ounces the agent suggested on that day.

**Mr. Pearson and Mr. Ortiz return and are arrested:**

After being gone for approximately 17 minutes, Mr. Pearson and Mr. Ortiz returned to the location of the DEA agent and Mr. Pearson's girlfriend. Mr. Pearson's girlfriend returned to the Tahoe. Then, according to a DEA report, Mr. Ortiz provided the methamphetamine to the agent. "Ortiz exited the vehicle [*i.e.* the Tahoe] carrying a white bag and handed it to [the DEA agent]." As described in the complaint filed in this case: "Pearson and Ortiz drove back to where the [agent] was waiting and gave the [agent] a plastic bag---believed to be the same plastic bag obtained by Ortiz---containing one large ziplock bag and a smaller cellophane bag, each containing a substance that appeared to be methamphetamine." Doc. 1-1 at 3.

After Mr. Ortiz gave the methamphetamine to the agent, Mr. Pearson then got out of the Tahoe. The DEA agent asked Mr. Pearson if they were able to get the additional amount, and Mr. Pearson affirmed: "Everything's good. Everything's in there." Moments later, at approximately 2:10 pm, Mr. Ortiz and Mr. Pearson were arrested. Law enforcement ordered the three occupants of the Tahoe to get out of the vehicle. All three complied with the orders.

The substance delivered to the DEA agent was tested. It had a net weight of 516.6 grams (equating to approximately 1 pound and 2.22 ounces).

After the arrest, Mr. Ortiz showed law enforcement the location of the apartment that he obtained the methamphetamine from. Mr. Ortiz told law enforcement that he is friends with "Manny" and met him at that apartment. He explained that once inside the apartment, he described seeing a "heavy set" Hispanic male on the couch and a "skinny" Hispanic male at the kitchen table counting money. After being shown a photograph, Mr. Ortiz identified Mr. Zavala-Acosta (co-defendant number 4) as the skinny male he observed.[4] As described in the PSR: "It was ultimately discovered that the methamphetamine sold to the [agent] had been provided from Zavala-Acosta to Ortiz, who then supplied Pearson." PSR at ¶ 22.

Later that night after his arrest, Mr. Pearson signed a Consent to Search form, allowing law enforcement to search his Tahoe. During a search of the vehicle, law enforcement recovered Mr. Pearson's cell phone. Also found was 28.7 grams of methamphetamine (*i.e.* the one ounce that Mr. Pearson made from the deal) and 2.796 grams of heroin (which Mr. Pearson had no involvement in).[5]

---

[4] After Manny returned to the apartment, he was then seen leaving the apartment with Mr. Zavala-Acosta. *See* PSR at ¶ 26; *see also id.* at ¶ 16. Law enforcement followed them in their car and contacted them in the parking lot of a restaurant. The photograph of Mr. Zavala-Acosta that was shown to Mr. Ortiz was taken during that parking lot encounter.

[5] Drug paraphernalia was also found on Mr. Ortiz's person. Lab analysis determined there was residue of methamphetamine, fentanyl, and heroin in that drug paraphernalia.

At approximately 5:20 pm on April 25, a search warrant was executed at the apartment Mr. Ortiz said he entered.  Although Mr. Pearson had no knowledge of the apartment, or the people and items found in or leaving it, *see* Doc. 93 at 7 n.2, the plea agreements of Mr. Padilla-Echeverria and Mr. Zavala-Acosta state those two "lived together in the Apartment."  Docs. 85 at 6; 88 at 6.  In the apartment, law enforcement located 2,711.6 grams of heroin and 3,143.7 grams of methamphetamine.  Mr. Jesus Adrian Padilla-Echeverria (co-defendant number 3) was in the apartment when it was searched, and he was arrested in the apartment.  Mr. Zavala-Acosta's ID was located in the apartment in a small closet with some of the recovered drugs.

## ARGUMENT

**This Court Should Vary Below the Statutory Minimum Sentence as an Equitable Remedy for Law Enforcement's Sentencing Factor Manipulation.**

"Sentencing factor manipulation occurs when the government improperly enlarges the scope or scale of a crime to secure a longer sentence than would otherwise obtain."  *West v. United States*, 631 F.3d 563, 570 (1st Cir. 2011).  This includes, for example, where "the government extends a criminal investigation for the sole purpose of increasing the drug quantities for which a defendant is responsible."  *United States v. Beltran*, 571 F.3d 1013, 1019 (10th Cir. 2009) (citing *United States v. Torres*, 563 F.3d 731 (8th Cir. 2009)).  That is precisely what happened here.

At the last minute, the undercover DEA agent requested a relatively small quantity of methamphetamine, on top of the originally agreed-upon substantial amount, for the purpose of increasing the total quantity to the 500 grams necessary to trigger a greater sentence, including a doubling of the statutory minimum.  As an equitable

12

remedy for this improper sentencing factor manipulation, this Court should find that it has the ability to vary below the statutory minimum sentence of 120 months. *See United States v. Rivera-Ruperto*, 852 F.3d 1, 14 (1st Cir. 2017) ("Where the government engages in such manipulation, we recognize the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy.")

Mr. Pearson pled guilty to one count of conspiracy to distribute 500 grams or more of a mixture and substance containing methamphetamine. The statute of conviction, 21 U.S.C. 841, differentiates punishment based on the quantity of drugs. An offense involving less than 50 grams of methamphetamine is punishable by 0 to 20 years of imprisonment; 50 grams to 499 grams is punishable by 5 to 40 years of imprisonment; and 500 grams or more is punishable by 10 years to life imprisonment. 21 U.S.C. 841(b)(1).

Mr. Pearson's conviction is based on two transactions involving methamphetamine. During the first, on March 25, 2019, Mr. Pearson distributed one ounce, or 28 grams, of methamphetamine to the DEA agent. Upon testing, it was determined to be 27.77 grams. On April 24, 2019, Mr. Pearson agreed to sell the agent one pound, or 448 grams. Had the agent not increased the amount 3 additional ounces, the total methamphetamine sold on the two transactions would have aggregated to **476 grams** of methamphetamine. Based on this quantity, Mr. Pearson would have faced a statutory sentencing range of 5 to 40 years in prison under § 841(b)(1)(B).

However, when Mr. Pearson met the DEA agent the next day to complete the transaction, the agent requested one pound plus three ounces, rather than the originally agreed upon pound. Mr. Pearson was initially unsure if he could acquire the additional three ounces; however, he ultimately returned to the agent with the extra methamphetamine. This raised the total amount of methamphetamine involved in the two transactions from below 500 grams, to over 500 grams. For example, the PSR attributes a total of 573 grams of methamphetamine to Mr. Pearson, based on the quantity of methamphetamine distributed and an additional ounce of methamphetamine found in Mr. Pearson's vehicle. *See* PSR ¶ 40. Absent the three additional ounces that law enforcement sought at the last minute – equating to 85 grams – Mr. Pearson would have been responsible for less than 500 grams.

Not coincidentally, the extra three ounces (*i.e.* 85 additional grams) doubled Mr. Pearson's mandatory minimum sentence from 5 years of imprisonment to 10 years; it also raised his statutory maximum penalty from 40 years to life in prison.[6] This constitutes sentencing factor manipulation. There is no proper investigatory purpose for requesting these few extra ounces at the last minute. The officer's motive for increasing the amount of methamphetamine was to increase Mr. Pearson's sentence.

The Tenth Circuit now recognizes that "a defendant's claim of sentencing factor manipulation may . . . be considered as a request for a variance from the applicable guideline range under the § 3553(a) factors." *Beltran*, 571 F.3d at 1019. Prior to

---

[6] The additional three ounces (*i.e.* 85 grams) also increased Mr. Pearson's base offense level under the Guidelines from level 32, U.S.S.G. § 2D1.1(c)(6), to level 34.

14

*Booker*, the Tenth Circuit held that sentencing manipulation claims could only be analyzed as a departure based on "outrageous government conduct," which requires a showing that "the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *Id.* at 1018. However, post-*Booker*, courts may review such claims under a less strict variance standard. *Id.* at 1019 (referring to the "standard for departure" as "stricter" than the standard for a variance). Moreover, while the Tenth Circuit has never considered whether a district court may vary below the statutory minimum sentence for sentencing factor manipulation, the First Circuit has held: "Where the government engages in such manipulation, we recognize the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy." *Rivera-Ruperto*, 852 F.3d at 14.

Such an equitable remedy is appropriate here. During the April 25 transaction, the agent requested from Mr. Pearson an extra quantity of methamphetamine on top of the agreed upon amount, just enough to trigger the 10-year mandatory minimum sentence (and enough to increase the guideline base offense level). The agent was "extend[ing] a criminal investigation for the sole purpose of increasing the drug quantities for which a defendant is responsible," in order to trigger the higher sentencing range. Because this is an improper motive, and blatant sentencing factor manipulation, this Court should not impose the improperly obtained enhanced sentence. Accordingly, this Court should vary below the statutory minimum sentence.

**A 97-Month Imprisonment Term Should Be Imposed.**

This Court should vary downward to the range that would apply without the Guideline's excessive calculation for "Ice" methamphetamine. That range would be 78 to 97 months.  *See* Doc. 98-1 at 2 n.1; *see also infra* footnote 1 and accompanying text.

This Court has previously articulated its view concerning a "policy disagreement with the Guidelines' treatment of offenses involving actual/pure methamphetamine." *United States v. Pereda*, 2019 WL 463027 (D. Colo. Feb. 6, 2019). And undersigned counsel has previously made similar arguments to this Court, which this Court expressed agreement. *See United States v. Clapper*, 18-cr-00139-CMA (D. Colo.), Doc. No. 75 at 4-9 (Part I.B. "Ice Methamphetamine: no empirical basis."). Those arguments are incorporated herein. Since then, other courts have joined the significant chorus on this issue. *See, e.g., United States v. Rodriguez*, 382 F.Supp.3d 892 (D. Alaska 2019); *United States v. Johnson*, 379 F. Supp. 3d 1213 (M.D. Ala. 2019); *United States v. Moreno*, 2019 WL 3557889 (W.D. Va. Aug. 5, 2019).

As this Court advised Mr. Pearson during his change of plea hearing, this Court should follow its standard practice and sentence Mr. Pearson within the Guidelines relating to a mixture containing a detectable amount of methamphetamine, rather than the Ice methamphetamine range.  As this Court has explained: "[E]ven the less-harsh methamphetamine mixture Guideline ranges are . . . higher than the ranges for similar quantities of heroin and cocaine...." *Pereda*, 2019WL463027 at *5 (quoting *United States v. Harry*, 313 F.Supp. 3d 969, 974 (N.D. Iowa 2018).

**HISTORY AND CHARACTERISITCS OF MR. PEARSON**

Mr. Pearson was an addict who was living an unstable life. Mr. Pearson started using methamphetamine almost 30 years ago, at age 20. In 2001, at age 31, he started using methamphetamine heavily. PSR at ¶ 89. After his release from BOP in 2014, he used methamphetamine daily, a quarter gram per day. *Id.* at ¶ 90. In December 2014, an evaluator's opinion proved prophetic. "Concern is drawn toward relapse potential during transition back into the community and limited social support. Of transient concern is client's financial situation which he states is a source of significant stress." PSR at ¶ 92.

At the time of his arrest, Mr. Pearson was living off and on at a motel. "The defendant reported co[u]ch surfing and staying at numerous hotels prior to his arrest. The defendant denied any stable housing location." PSR at ¶ 79.

Concerning employment, he was working with a friend "cleaning out structures for cash." *Id.* at ¶ 73. He also was a scrapper. He "bought, sold, and traded goods at local flea markets for income." *Id.* He would clean out apartments, homes, and storage units. He would also buy and sell items on the internet or at auctions. PSR at ¶ 109. As explained in the PSR: "He cited a need for money as the reason behind his involvement in the instant offense." *Id.* at ¶ 73.

The most meaningful, stable support for Mr. Pearson is his mother, who lives in Montana. The two have a very close relationship. Mr. Pearson visits his mother in Montana "a few times a year." PSR at ¶ 68. He talks with her on a daily basis,

17

including while in custody. *Id.* She told the Probation Office that her son "is a very good person, but his drug addiction has led him down the wrong path." *Id.*

His mother has written to this Court about Mr. Pearson. She explained how Mr. Pearson is her only child. "He has a good heart, he loves his music, he is sociable, he can be kind and loving. Unfortunately, he made so many wrong choices due to his drug addiction and that breaks my heart."

Mr. Pearson was in custody when his father passed away, PSR at ¶ 71, and he is desperate to avoid the same fate with his mother. "He hopes to be released from custody before her passing." *Id.* His mother, too, expressed the same hope. "I am going up in age and if he has to serve a long time in prison, I may never see him again." As his mother wrote to this Court: "I am the only one he has left."

Although living with his mother and step-father is not an option, Mr. Pearson has considered moving to Montana in order to assist in establishing a more stable, law-abiding life.

Finally, as explained in the PSR, Mr. Pearson "acknowledged his need for future substance abuse treatment. He requested the Court recommend he enroll in the RDAP program." PSR at ¶ 94. While in custody in this case Mr. Pearson has attended four therapy sessions at the Clear Creek County Jail.

## CONCLUSION

WHEREFORE, after considering the history and characteristics of Mr. Pearson and the nature and circumstances of this case, this Court should impose an imprisonment term of <u>97 months</u>, or alternatively, if the Court finds that it is constrained

by the mandatory minimum, *but see infra*, of 120 months.  18 U.S.C. § 3553(a)(1). Such a sentence would be sufficient but not greater than necessary (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).

It would also take into account the advisory guideline range, while recognizing the sentencing factor manipulation that occurred in this case.  18 U.S.C. § 3553(a)(3), (4), (5) and (6).  And, finally, the Court should recognize that the guideline range for this case involving Ice methamphetamine is deeply flawed, not supported by empirical data, not the product of the Commission's institutional expertise and analysis, and in this case, a within-guideline sentence would therefore fail to comply with Section 3553(a). 18 U.S.C. § 3553(a)(1), (6).

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/ David E. Johnson
DAVID E. JOHNSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_johnson@fd.org
*Attorney for Defendant Craig Michael Pearson*

CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2019, I filed the foregoing ***Defendant Pearson's Motion for Below-Guideline Sentence*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address and all other parties of record:

Andrea L. Surratt, Assistant United States Attorney
E-mail:  andrea.surratt@usdoj.gov

David A. Tonini, Assistant United States Attorney
E-mail: David.Tonini@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Craig Michael Pearson (via U.S. mail)
Reg. No. 09497-051
c/o Clear Creek County Jail

                                           s/ David E. Johnson
                                           DAVID E. JOHNSON
                                           Assistant Federal Public Defender
                                           633 17th Street, Suite 1000
                                           Denver, CO  80202
                                           Telephone:  (303) 294-7002
                                           FAX:  (303) 294-1192
                                           David_johnson@fd.org
                                           *Attorney for Defendant Craig Michael Pearson*