IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-227-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. CRAIG MICHAEL PERSON,

    Defendant.

## GOVERNMENT'S OPPOSITION TO DEFENDANT CRAIG PEARSON'S MOTION FOR A BELOW-GUIDELINES SENTENCE

The United States of America, by and through the undersigned Assistant United States Attorney, for the reasons that follow, objects to defendant Craig Michael Pearson's motion for a sentence below his Guidelines range and also below the mandatory minimum sentence in this case.

### FACTUAL BACKGROUND

In spring 2019, Pearson and an undercover officer (the "UC") communicated on Facebook, during which communications Pearson agreed to sell the UC two ounces of methamphetamine for $450. The UC expressed that good-quality methamphetamine was important to him. (PSR ¶ 9). On March 25, 2019, Pearson met the UC to consummate the deal, but told the UC that he (Pearson) had only one ounce available for sale. The UC purchased the ounce of methamphetamine for $300. Pearson told the UC that in the future he (Pearson) would be able to sell the UC a full pound of meth. (PSR ¶ 10). On April 24, 2019, the ounce of methamphetamine that Pearson sold to

1

the UC was lab-tested and tested positive for 27.77 grams of 99% pure methamphetamine. (PSR ¶ 11).

Subsequent to the methamphetamine sale described above, Pearson and the UC remained in contact. On April 22, 2019, Pearson told the UC that he (Pearson) would be able to sell a pound of meth for "32 to 33 for the full one"—meaning $3,200 or $3,300 for a full pound of methamphetamine. (PSR ¶ 12). On April 25, 2019, Pearson and the UC met to complete the deal. The UC asked Pearson if he (Pearson) could get an additional three ounces of methamphetamine, for a total of one pound plus three ounces. (PSR ¶ 13). Pearson agreed to try, and ultimately delivered a bag containing the pound plus three ounces. On May 31, 2019—after the indictment in this case was returned—the methamphetamine from April 25, 2019 was lab-tested and determined to be 516.6 grams of methamphetamine that was 99% pure. (PSR ¶ 14).

Considering just the April 25, 2019 sale, therefore, Pearson sold the UC 516.6 grams of mixtures and substances containing and detectable amount of methamphetamine, or 511.43 grams of pure methamphetamine.[1]

## PROCEDURAL HISTORY

The defendant was charged in two counts of a four-count indictment on May 8, 2019. (Dkt #37). On October 23, 2019, the defendant pled guilty to Count One of the Indictment pursuant to a plea agreement. (Dkt #93). In his plea agreement, the defendant admitted that the methamphetamine that he sold to the UC was 99% (+/- 4%)

---

[1] As the Court knows, 21 U.S.C. § 841(b)(1)(A)'s mandatory minimum for methamphetamine is satisfied in two ways: with 500 grams or more of mixtures and substances of methamphetamine *or* 50 grams or more of pure methamphetamine. Here, although Pearson was charged with the former since the lab results on the April 25, 2019 sale had not yet been completed by the time of indictment in this case, his conduct far exceeds the latter threshold as well.

pure. (Dkt # 93).

Count One, which charged a violation of 21 U.S.C. §§ 841(b)(1)(A) and 846 for conspiracy to possess with intent to distribute 500 grams or more of mixtures and substances containing a detectable amount of methamphetamine, carried a mandatory minimum sentence of 10 years' imprisonment. None of the applicable exceptions— such as eligibility under the safety-valve provisions enumerated in 18 U.S.C § 3553(f) or a Government motion under 18 U.S.C. § 3553(e)—to this statutory mandatory minimum apply to this defendant.

## ARUGMENT

The defendant contends that, by asking the UC for three additional ounces of methamphetamine on top of the already-agreed about pound of methamphetamine (after the defendant asked to keep some of that pound for himself), the Government's conduct was so egregious and outrageous that it constituted "law enforcement sentencing manipulation." Accordingly, the defendant argues, this Court can, and should, ignore the statutory mandatory minimum and sentence the defendant to 97 months' imprisonment as an "equitable remedy." (Dkt # 114). This argument should be rejected for multiple independent reasons, as follows.

### The Tenth Circuit Does Not Recognize Sentencing Factor Manipulation as an Avenue To Sentence Below the Mandatory Minimum

In *United States v. Beltran*, 571 F.3d 1013 (10th Cir. 2009), the Court explained that sentencing factor manipulation derives from the concept of outrageous government conduct, which is "a due process principle allowing a court to modify a sentence if, considering the totality of the circumstances, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *Id*; *see also*

*United States v. Lacey*, 86 F.3d 956, 963 (10th Cir. 1996) (explaining that sentencing factor manipulation claims are analyzed under the rubric of "outrageous government conduct," where the "relevant inquiry is whether, considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice"). More generally, "outrageous government conduct" prevents the government from prosecuting—or, in this case, sentencing for—a crime developed through egregious investigatory tactics. *Lacey*, 86 F.3d at 963.[2]

Under the pre-*Booker* mandatory Guidelines regime, "outrageous governmental conduct may warrant a departure in an extreme case." *Id.* at 1018-19. *Beltran* held that this pre-*Booker* standard as it applies to outrageous government conduct remains good law. *Id.* at 1019. Post-*Booker*, in cases of outrageous government conduct, "a defendant's claim of sentencing factor manipulation may also be considered as request for a variance from the applicable guideline range under the § 3553(a) factors." *Id.*.

Accordingly, *Beltran* explicitly allows this court to consider sentencing factor manipulation as a grounds for a departure or a variance when fashioning an appropriate sentence in extraordinary cases that present "outrageous government conduct," but the Tenth Circuit has never recognized it an avenue for relief from an otherwise-applicable statutory mandatory minimum. For this reason, this court should abide by Title 21's statutory scheme an impose a sentence consistent with the mandatory minimum of 10 years' imprisonment. *See, e.g.*, *United States v. Payton*, 405 F.3d 1138, 1173 (10th Cir.

---

[2] Though the decision was, admittedly, over 20 years ago, the *Lacey* court noted that at the time the court had *never* "been presented with government conduct sufficiently egregious to warrant a dismissal," a testament to the concept's "narrow scope." 86 F.3d at 964.

2005) (reaffirming that district courts have no discretion under Title 21 to do other than impose the appropriate mandatory minimum sentence).

### The Government's Conduct Was Not "Extreme And Unusual" And Does Not Justify Equitable Relief

Recognizing that *Beltran* does not give this court the authority to grant the relief he seeks, the defendant points to the First Circuit's[3] opinion in *United States v. Rivera-Ruperto*, 852 F.3d 1 (1st Cir. 2017), which recognized "the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy" when "government agents have improperly enlarged the scope or scale of a crime." *Id.* at 14 (internal quotation marks and alterations omitted).[4]

In order to qualify for such relief in the First Circuit—and in every other circuit that recognizes some form of sentencing factor manipulation relief—the defendant's burden is exceptionally high. The First Circuit noted that because "by definition, there is an element of manipulation in any sting operation," such relief is reserved for "the extreme and unusual case." *Id.* at 15 (internal quotations and alterations omitted). Such a situation would involve "outrageous or intolerable pressure by the government or illegitimate motive on the part of the agents." *Id.* at 15 (internal quotations and alterations omitted). Indeed, "such manipulation occurs only when the authorities venture outside the scope of legitimate investigation and engage in extraordinary

---

[3] The Circuits have taken various approaches to sentencing factor manipulation, including whether it is recognized at all. *See Beltran*, 571 F.3d at 1029, n.1 (collecting cases).

[4] The Eleventh Circuit, too, has addressed the intersection of sentencing factor manipulation and statutory mandatory minimums by noting that "[e]ven though sentencing factor manipulation by the government may occur during the course of an investigation, a district court still cannot disregard a mandatory minimum, because Congress has only authorized departures from statutory mandatory minimums in limited circumstances." *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007). Rather, conceptually, if the Court finds the object of the sentencing manipulation to be so objectionable that it is "filter[ed] . . . out of the sentencing calculus" then the mandatory minimum simply does not apply at all. *Id.*

5

misconduct that improperly enlarges the scope or scale of the crime." *United States v. Sanchez-Barrios*, 424 F.3d 65, 78 (1st Cir. 2005).  Relief for sentencing enhancement manipulation is not appropriate when the conduct does not exceed the "level of manipulation inherent in virtually any sting operation" or when "the government did not lure the [defendant] into committing crimes more heinous than [he was] predisposed to commit."  *Id.* at 79.   The defendant bears the burden of establishing sentencing factor manipulation by a preponderance of the evidence.  *Rivera-Ruperto*, 852 F.3d at 15.

Even if the Tenth Circuit was to allow for equitable relief in the form of a sentence below the statutory mandatory minimum, it is not appropriate here.  The Government's conduct was not so "shocking, outrageous and intolerable that it offends the universal sense of justice," *Beltran*, 571 F.3d at 1019, and the defendant cannot claim that it was. The defendant was willing and able to sell large quantities of pure methamphetamine, and was happy to continue doing business with the UC.  He explained to the UC that he sold methamphetamine as a "side hustle" and had a price schedule that he shared with the UC.  Pearson initially agreed to sell one pound of methamphetamine from his usual suppliers, and assured the UC that it is "usually pretty smooth the people I deal with." When that source of drugs apparently fell through, Pearson was able to quickly locate another supplier for the pound of methamphetamine through Ortiz.  And when asked about the additional three ounces, Pearson's only protest was that he had to query his supplier, and in the end had no trouble meeting the request.  In the end, of course, given the quantities of drugs in the stash house apartment, the additional meth proved to be no problem at all.

In other words, in April 2019, Pearson had access to not just one, but two,

6

pound-quantity suppliers of methamphetamine. Given that Pearson was in the business of dealing drugs to make money, and given the apparent ease with which he was able to find a second source of a large amount of methamphetamine, it cannot be said that the UC's request for three additional ounces (after Pearson expressed an interest in keeping some of the initial pound for himself) constituted " extraordinary misconduct that improperly enlarge[d] the scope or scale of the crime." *Sanchez-Barrios*, 424 F.3d at 78.

Finally, and fatally to the defendant's argument, the UC did not ask for three extra ounces in a scheme to bump Pearson over the 500 gram mark. As noted below, the DEA was already confident that Pearson's sales would easily exceed 50 grams of pure methamphetamine—the amount necessary for a 10-year mandatory minimum sentence—so there was no need to engage in mathematical methamphetamine manipulation. Further, as a factual matter, the DEA asked for the additional three ounces for two reasons. First, Pearson asked the UC if he could keep ½ ounce (and then later, one ounce) for himself. In response, the UC said that would be fine, but the problem was at the UC's customers were expecting a whole pound—so Pearson would need to get more meth for the UC in order to keep a portion of the total sale for himself. Second, the UC was authorized to spend $4,000 of DEA buy money. Since the DEA's plan for April 25, 2019 was to arrest Pearson after the deal was done, there was no risk that the buy money wouldn't be recovered. So when it became clear that the deal would be for more than a pound—so that Pearson could keep some for himself—the UC added up how much meth he (the UC) thought that he could buy for $4,000, and settled on 1 pound, 3 ounces. Ultimately, Pearson accepted the proposal of $4,000 for 1

pound plus 3 ounces of methamphetamine, with Pearson keeping an ounce for himself.

At bottom, this is a case where Pearson—a life-long drug dealer with three prior federal narcotics convictions—had ready access to pound-quantities of methamphetamine. For reasons that had nothing to do with the mandatory minimum sentence in this case, the DEA asked Pearson for 3 additional ounces, on top of the already-agreed upon pound so that Pearson could keep some drugs for himself—hardly "outrageous or intolerable pressure by the government," *Rivera-Ruperto*, 852 F.3d at 15, or conduct that was so "shocking, outrageous and intolerable that it offends the universal sense of justice," *Beltran*, 571 F.3d at 1019.

This is not a case where sentencing factor manipulation would work to give Pearson a path even to a variance or a departure—much less the unprecedented and extraordinary remedy of piercing a statutory mandatory minimum. Accordingly, even if sentencing factor manipulation gives this court a theoretical path to sentence the defendant under the mandatory minimum, the argument easily fails in this case.

### The Defendant Sold the Undercover Well Over the Mandatory Minimum Amount of 50 Grams Or More of Pure Methamphetamine

Finally, the defendant's entire argument revolves around the additional three ounces of methamphetamine sold to the UC that the defendant claims bumped him from a 5-year mandatory minimum under Section 841(b)(1)(B) to a 10-year mandatory minimum under Section 841(b)(1)(A). The law aside and equities aside, this argument fails on its own terms because the defendant was well over the 10-year mandatory minimum amount of methamphetamine even without those additional three ounces.

Title 21, United States Code, Section 841(b) provides the penalties for distributing various amounts of controlled substances. A 10-year mandatory minimum

8

sentence applies to 500 grams or more of mixtures and substances containing a detectable amount of methamphetamine *or* 50 grams or more of pure methamphetamine. In this case, when the defendant was indicted, the DEA did not yet have the lab results back on the methamphetamine that the defendant sold to the undercover on April 25, 2019. Accordingly, the DEA could not yet assert that the amount of drugs was 50 grams or more of pure methamphetamine. Rather, all that could be said with requisite certainly on May 8, 2019—the day the indictment was presented to the grand jury—was that the defendant had conspired to sell more than 500 grams of mixtures and substances containing methamphetamine to the undercover officer.

On May 31, 2019, however, the lab results were in and it was clear that the defendant distributed well over 50 grams of pure methamphetamine. Indeed, since the 516 grams of methamphetamine distributed on April 25, 2019 was 99% pure, that one sale was over 10 times the amount of methamphetamine needed to satisfy 21 U.S.C. § 841(b)(1)(A)'s 10-year mandatory minimum. The extra three ounces did not make a difference. Of course, the Government did not supersede its indictment against the defendant to change "500 grams or more of mixtures and substances" to "50 grams or more of methamphetamine" because it was not necessary—either formulation satisfies Section 841(b)(1)(A).

Moreover, even before the lab finished its analysis, agents were confident that the methamphetamine would be very pure. As an initial matter, the defendant's first sale of methamphetamine to the UC was 99% pure, and the UC made clear that purity was important to him. There was no reason for the DEA to think that this second sale

9

would be any different.  Further, given that, at the time Pearson was indicted, the DEA knew that the methamphetamine sold to the UC came directly from a stash house operated by Mexican nationals who likely imported the methamphetamine directly from Mexico, the DEA was all but certain the methamphetamine would be extremely pure.  In particular, there was no reason for the DEA to think that the second sale of a pound—or 456 grams—of methamphetamine would be so *impure* that it would fail to exceed 50 grams of pure methamphetamine.  In other words, the DEA would never have even fathomed that 456 grams of methamphetamine that the defendant sold to the UC would have been only 11% pure—the highest purity at which the additional 3 ounces could have possibly mattered for statutory mandatory minimum purposes.

The DEA's assumptions about the purity of the April 25, 2019 methamphetamine were, of course, borne out by the lab results.  But their initial assumptions were well-founded in experience and data.  Indeed, this court, in expressing its disagreement with the dichotomy between the "ice" and "mixtures and substances" Guidelines for methamphetamine noted that "[t]he average purity of all methamphetamine in the United States is greater than 90 percent—and has been since 2011 . . . ."  *United States v. Pereda*, 18-cr-228-CMA.

In short, the three additional ounces of methamphetamine—three ounces of methamphetamine that the defendant claims is the result of such "outrageous" and "extreme" Government conduct to warrant an extraordinary remedy of the kind that has never been recognized by the Tenth Circuit—do not matter.  The defendant's conduct put him well over the amount of methamphetamine needed to satisfy the mandatory minimum and if the Government had needed to, it would have presented a superseding

indictment to the grand jury on the basis of the 99% purity of the April 25, 2019 methamphetamine sale. The exceptional equitable relief that the defendant seeks is not appropriate here.

### A Guidelines-Range Sentence is Appropriate

The defendant's novel argument aside, this case, and this defendant, do not provide the appropriate vehicle for the defendant's unique equitable relief theory. A within-Guidelines sentence of 151 months' imprisonment is entirely appropriate in this case for the reasons stated in the Government's sentencing submission filed on December 31, 2019. Given the defendant's criminal history and characteristics and the nature of this offense, the defendant is not deserving of the leniency that he seeks.

### Conclusion

For the reasons stated herein, the Court should deny the defendant's motion.

Respectfully submitted this 7th day of January, 2019.

        JASON R. DUNN
        United States Attorney

By:   *s/ Andrea Surratt*
       Andrea Surratt
       Assistant United States Attorney
       U.S. Attorney's Office
       1801 California St., Suite 1600
       Denver, CO 80202
       Telephone: (303) 454-0100
       e-mail: Andrea.Surratt@usdoj.gov
       Attorney for the Government